Now we'll hear Star Funding v. Tire Centers. There's sort of a hubbub as people are leaving, so we'll just wait a couple minutes. My feelings are a little hurt. Well, I must say there's a diminished interest in your argument, it appears. You didn't bring your audience with you, so... Besides, think about my feelings. Okay, seems like things have subsided. Good morning, Your Honors. May it please the Court, my name is Alex Spitz and I'm here with my colleague Deborah Bernstein. We represent the Plaintiff Appellant. Star Funding in this action is respectfully submitted that the District Court erred in granting summary judgment dismissing the action against TCI, finding that there was no issue of fact to be decided, and accordingly the judgment below should be reversed. The only thing I think that the appellee and the appellate agree on is that the star was the victim of an elaborate fraud. And that fraud could not have happened but for the actions and the conduct of TCI, the defendant, and its dishonest employee, Jason Powell. And therefore, they should bear the responsibility for Star Funding's loss. The case hinges on a concept of apparent authority. And apparent authority requires that the principal be responsible for the appearance of authority. And that the third party reasonably relies on that appearance. One of the issues that came up, and I think, and what the judge, in a colloquy with the District Court judge, and as well as in his brief decision at the end of the transcript, was that he was concerned that there was no direct contact. That TCI never had any direct contact of communication with Star Funding. That's not necessary, Your Honors. No direct contact by the principal to the third party is necessary. Apparent authority can be created merely by appointing somebody to a position such as a manager, which carries with it the recognized duties of that person. On the other hand- Yes, Your Honor. The court asked you, and this is at 392 of the appendix, is there some testimony in this case by anybody on your side, or their side, that a person with this kind of title in any of these businesses necessarily has this authority? And you said, no, Your Honor. The answer is that what happened was in that- Taking it out of context. Yes. We're talking about, we were talking about the, at least I believe the court was talking about the tire industry. And that there is nothing different about the tire industry than all the other industries Star looked at. If you look at, Your Honor, it's found in the appendix- What other industry are we in but the tire industry? Well, but see, Star Funding, Star Funding finances- Yes. So they deal in thousands of transactions in a myriad of industries. All they're basically doing is funding basically commodities. A tire is nothing more than a commodity like any other commodity. The testimony was, and if you read in the record, Your Honor, in the appendix 395 to 400, that's where I advised the court that the vice president of Star Funding, Joanna Herr, testified that in her 20 years of experience in doing purchase order financing, that persons who have the title of business development manager generally have the authority to do the kind of transaction that is involved here. That's in the record. But as far as the tire industry is concerned, I admit to the court, I have no evidence that that means that in the tire industry. But according to the plaintiff, there is no reason, basis for the plaintiff to believe that the tire industry should be different than any other industry. There's nothing unique about the tire industry. They had the right to rely- Someone's a business- The backup purchase agreement reliance, appendix 239, just looks like something you'd get when you went in to purchase a tire. It says all wheels have been torqued. How could that be taken as a backup purchase agreement? Well, it does say- How could you rely on that? It does say on the purchase order. It does say on the document that it is a purchase order. And what the plaintiff testified, and again, doing thousands of transactions, there is no one form of purchase order. Purchase orders come in all different forms. There's a better form in the record. Could it have been a better form? This is what they issued. They had, in their opinion, in their reasonable opinion, they had no reason not to believe this was a valid purchase order. You can be sure, Your Honor, if they had any doubts, any doubts that this was a valid purchase order, wasn't a valid purchase order, they would be gone. They would have done the transaction. The transaction was dependent on having a valid backup purchase order from a reliable, creditworthy purchaser. Here, if they had any doubts, they wouldn't have done it. What happened here was we believe that there was nothing that required any inquiry. And I guess, like this court held in the Herbert construction case, I believe, it said that really what inquiry is really another way of saying whether or not, in this case, the plaintiff acted reasonable. We believe it's a question of fact. But your client did have its suspicions, and why wouldn't you have suspicions? The purchase order provided for Volt to sell the tires, and yet for the tires to be delivered to Volt. Correct. Well, we knew the tires weren't going to be delivered to Volt because it was going to be TCI that was going to be accepting it, and they used Volt's address. It's being shipped to an office park. These are four-ton tires. But it was never intended to be shipped. Everybody knew it was never intended to be shipped to the office. So basically you have a purchase order in which the transaction is being mischaracterized. We don't know where it's going to be shipped. We don't know who's going to take it, and we have no idea where people are going to store it. So your client was suspicious. The answer is yes, the client was suspicious. And what did they do? They contacted Mr. Powell, and they were satisfied with his explanation. But where I think this goes to, Your Honor, it goes to the fact of reasonableness. Were they reasonable? The district court found as a matter of law, in fact, excuse me, the district court never got to the issue of reasonableness. The district court decided the issue on three things at the very end. It said, one, there was no apparent authority, which we admit there was no apparent authority. Two, that there was no direct contact. We agreed there was no direct contact. And three, what the district court essentially held was the title of a business development manager, as a matter of law, could not have induced somebody into doing this transaction. And I think the court is wrong by that. That's a jury question. That's a trial question. That was the question Judge Jacobs asked you about where was the evidence of this. Because I will say to you, just the terms by themselves, business development managers suggest that the person's responsibilities are selling inventory, not acquiring it. And that's the problem here, is this was a backup acquisition of inventory, namely these tires. And what would make anyone think that a business development manager would have that kind of authority and responsibility? Well, I submit, Your Honor, that they claim that Mr. Powell was nothing more than a salesman. I'm not asking you that. I'm asking you what evidence there is to support it, because you can say something's a question for the jury, but there has to be enough evidence to do that would allow the jury to find in your favor on that. And in the record, there's the evidence at the deposition of the plaintiff, where the plaintiff testified that based upon, and it is also in the oral argument, as I pointed out before the district court on pages 395 to 400. It was pointed out that Star Funding has been doing this since 1999. They've been dealing in thousands of transactions in a myriad of different industries with many, many different commodities. And what the vice president of Star Funding said, that in her experience, that somebody with the title of business development manager has the authority to do this type of transaction. You didn't point to a single occasion when they had a transaction with a business development manager. That was a conclusion. Now, where is the evidence to support it? Your Honor, she was being asked a question by the defendant. But to defeat the motion, you had to come forward with evidence that was enough to get you to a jury. Well, I believe, Your Honor, that her testimony, that this is her experience, which I think creates a question of fact, whether or not they were reasonable. I think it's error for the district court to hold that it was totally unreasonable for them to rely on the title of business development manager. And I think that their experience over 20 years doing thousands of transactions should be enough to get this case to a jury. You've reserved rebuttal. Yes, I'm sorry, Your Honor. You've reserved rebuttal. Yes, I did. Thank you. May it please the court. My name's Peter Herzog, and I represent Tire Centers, a subsidiary of Michelin. The court can affirm the district court's grant of summary judgment on any one of three grounds. First of all, Star Funding advocates the wrong standard. And the correct standard is that there has to be proof of misleading conduct on the part of the principal. And Mr. Spiz admitted at argument, and we've cited to it in the record, that there was no misleading conduct on the part of the principal at Tire Centers. Except for issuing the business cards that gave this guy a glorified title. I don't know what it means either. Well, that's correct, Your Honor. But that was his title. That was not misleading conduct. That was his actual title. Yes, and if you were going to develop business, you could develop, depending on the business you're in, you could develop business of buying stuff or the business of selling stuff. Right? I don't think we're going to, I think we've cited to the several cases, Your Honor, where the courts have held that the title is not enough unless the title is of an executive level title that carries with it implied authority to do certain actions on behalf of the corporation. The second basis, so Star Funding just has the wrong standard. In New York, the standard is misleading conduct on the part of the principal. They advocate a different standard. They advocate Section 27 of the Restatement. Section 27 of the Restatement has never been adopted by the New York courts. It was cited in one case, but Comment A, which they rely on, and the Restatement itself has never been adopted by the New York courts. It's not the law in New York. But even if it was, and this is what Judge Daniels said at argument, even if it is, you don't meet it for the very reasons, Judge Jacobs, that you asked Mr. Spiz about. He said, where is your evidence, Mr. Spiz, of this business development manager title in the entire business having the authority to purchase tires? And Mr. Spiz said, I don't have any evidence of that. And then he went on to say, just as he did today, but it isn't the tire business that's relevant. And he's just wrong on that. The Star Funding cites to the Property Advisors case. And the Property Advisors case dealt with a circumstance where they were looking at the duties of the individual in the industry where they were claiming that it was implied authority. And the Property Advisors case said specifically that that's the industry you look at. You don't look at Mr. Spiz's client's industry. You look at the industry where the alleged conduct that's giving rise to the claim of apparent authority is being evaluated. And in that context, it was a commercial real estate building, and there was a manager in the building who the evidence showed in New York generally, this particular title in this particular industry generally negotiated the agreements on behalf of the landowners because there are so many landowners that are absent. This was generally their responsibility. There was no evidence of that in this case. In this case, the only evidence was that Mr. Powell and business development managers and salesmen at TCI were completely precluded from making tire purchases. That was the evidence. There was a specific policy in place at TCI to prevent and prohibit its salesmen from making tire purchases, and there was a specific policy in place here. So those are two independent bases on which the court can affirm. The third one is that there were red flags, a blizzard of red flags is how we describe it. You're talking about reasonable reliance now? No reasonable reliance, Your Honor. But the district court, did the district court make that conclusion? The district court did not make that conclusion, but this court can affirm on any basis that's found in the record, and that basis is adequately. But usually we kind of look at what the district court did. How do we do that without the district court reaching that issue? I think you can do it on the basis of the materials in the record, Your Honor. The materials in the record establish, and you raised a number of questions about them yourselves, these are the purchase orders that are at issue. They're at 227 and 239 of the appendix. The court can, and we've cited to the various testimony that's in the record, the court can take a look at it. There are a large number of irregularities that the court has already noticed in some respect. One thing I will tell you, though, that I think the court can easily conclude. Mr. Spitz, in his brief, tells you they don't care what a purchase order looks like. They're not worried about that. All they care about is that the purchase order reflects that the purchaser is going to buy the same goods as are being purchased by his client on behalf of who he's actually financing. And on these purchase orders, Your Honor, the tires are not described by serial numbers. They're just general descriptions of these big earth mover tires. Without the serial numbers on the tires, now these tires, I think the court knows from our briefing, these tires sell, they're specially manufactured. They sell for $30,000 to $50,000 each. In times of high demand overseas, the secondary market, they can sell for $60,000, $70,000, $80,000 each. They all have serial numbers on them. And unless you have the serial numbers on the invoice, there's no way. What do we do with the fact that Star Funding is in the business of financing purchase orders? And they finance purchase orders for tires. If it was a circus, they would do purchase orders for elephants. They deal in every which area. And the question is then, are we looking at the reasonableness of the kind of inquiry that would be made by a company like Star Funding, which does not have knowledge of individual practices and individual industries, but just relies upon the fact that people have some external ability conferred on them by, say, your client, to enter into transactions? I'll answer that. Because you're saying, well, you know, with a tire this big, you ought to have a serial number. Well, I don't know. Until you said that, I didn't know that. And I'm not sure Star Funding should be required to know that. Let me answer that in two ways, Your Honor. The duty to inquire arises whenever there's a novel transaction or an unusual transaction or whenever there are facts that would cause a party to be put on notice that something may be askew. This was unquestionably a novel transaction for Star Funding. They had never been in the business of doing purchase order financing for a wholesale tire business previously. But it's not unreasonable, if you're in the purchase order financing business, to be financing purchase orders in various industries, none of which you may know a lot about. I understand that, Your Honor. And what the testimony was was that they had done, and I think it was Ms. Earhart who said, we've done gazillions, gazillions of purchase order financing transactions previously. And guess how many times in those gazillions of transactions they had ever required a backup purchaser. This was the first. They understood that this was a novel, unusual transaction that they had not been previously involved in. That's an admission on its own, Your Honor, that they needed to conduct a reasonable inquiry. They didn't conduct a reasonable inquiry, despite all of these red flags that came into existence. If they've never done one of these transactions before, and they never, in a gazillion transactions, have ever required a backup purchaser, what does that tell you? They were concerned. But rather than do a reasonable inquiry, they asked the individual who they were concerned about, why they were buying the tires from the person they were supposedly, why they were selling the tires to the person they were supposedly buying them from, and didn't follow up and then ask, well, why, if you're buying the tires, are you delivering them to the person that you are buying them from? These were all reasonable inquiries that could have been made, that should have been made, that would have uncovered what they claimed was the fraud that was perpetrated on them, that was also perpetrated on us, and, Your Honor, they didn't do any of it. They said this isn't relevant to us, but it should have been. Thank you. Thank you. We will hear rebuttal. Thank you, Your Honor. My colleague here, again, harps on the misleading conduct. Again, we've cited several cases in our brief that apparent authority can be created merely by appointing a person to a position such as a manager. Now, it is true, and those cases all refer to the restatement second of agency, section 27. While it is true it has not been formally adopted by the state of New York, it has certainly been followed by the courts in the state of New York, including the Court of Appeals, since 1980, in the case, I think, with Judge Fuchsberg. So it is maybe not mandatory, but it has certainly been followed, including by the highest court of the state of New York. You've got to remember, tire centers is not just, they don't sell tires, they're a dealer and distributor. They buy and sell. This particular transaction, when Smoke made good business sense, they were going to get these tires at cost. And they weren't just buying Michelin tires, these were Bridgestone, these were Goodyear, and they would be able to sell them at a big profit. We were just looking for a backup. There is nothing in the record that indicates that in any way that star funding had any inkling. Why would a backup purchaser want the goods to be delivered to the seller? The backup purchaser wouldn't. In fact, the backup purchaser would always take delivery. It would be 8,000-pound tires. I mean, you're delivering them to an office park? I mean, what would my doorman say if somebody delivered an 8,000-pound tire? The whole thing. Well, I understand. I mean, this is a very practical question. Judge, you are absolutely correct. However, what happened here was it was an obvious error, all right? It is an obvious error. It was an obvious error. But did it rise to the level, which then my client vetted Mr. Powell, did it rise to the level where a reasonableness that they should have now said, well, wait a minute, because of this, I've got to call some office in North Carolina or something and find out whether you really have the authority to do what you're doing? I don't think so. It's a couple million dollars, isn't it? Yes, Judge. And it hasn't reached the point where a couple million dollars isn't worth making. But TCI is in the business of selling these tires and buying and selling these tires. And he said I can get it. These are hot commodities. As many as I can get my hands on, I can get rid of and I can sell. I'm pleased to get whatever I can get. It all made sense. And they gave them all the trappings of somebody in that kind of authority. Fraud always makes sense. It does it to laughter. But if he was just a salesman, if he was just a salesman, why didn't he have a title salesman, sales executive, salesman? That I understand. Titles do matter. In the Foot Locker case, which they cite,  and they did something with regard to accounts. They verified accounts receivable. That's not what you have here. If he was a salesman and he did this, I agree, that would have raised some really flags. What does a salesman have to do with this? But a business development manager, just Google business development manager, and you'll see it's somebody in a management position who has the authority to develop new markets, new products, new ways of getting business other than standard selling the product. That's what a business development manager is supposed to do. If he was just a salesman, why didn't they call him a salesman? I submit, Judge, the questions here, the issues here, and I admit there are issues, but they're issues of fact that should be tried by a jury. Thank you, Your Honor. Thank you both. We'll reserve decision.